## LE DOUX v. UNITED STATES LINES CO.
### No. 382.

District Court, E. D. New York.
Feb. 21, 1940.

August Paul Knatz, of New York City (Harry Nathanson, of New York City, of counsel), for plaintiff.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Vernon S. Jones and Robert P. Nash, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This action was originally brought on, as an action at law, in the Supreme Court of the State of New York, Kings County, and was removed to this Court, because of diversity of citizenship.

This action, which was for damages for personal injuries was tried before the Court without a jury.

At all the times hereinafter mentioned, and at the time of the trial, the defendant was a foreign corporation duly organized and existing under the laws of the State of Nevada, with offices in the Borough of Manhattan, City and State of New York, for the transaction of its business in the State of New York.

At all the times hereinafter mentioned, and at the time of the trial, the defendant was the owner of a certain steamship or vessel, known as the American Banker.

At all the times hereinafter mentioned, the defendant was in possession, and control of the aforementioned steamship or vessel.

At all the times hereinafter mentioned, the defendant was a common and public carrier for hire of both passengers and freight.

At all the times hereinafter mentioned, the plaintiff was a passenger, for hire, of this defendant on the aforementioned steamship or vessel.

The steamship American Banker left New York City on May 13th, 1938, bound for London, England, with the plaintiff on board as a passenger.

The plaintiff's heart had, prior to and at the time of sailing, showed evidence of coronary sclerosis, that is the heart muscle was getting inadequate blood supply. She had been upset and had been in bed for three weeks and thereafter had been up for about three weeks before sailing. A checkup by her Doctor, to determine whether it was alright for her to take the trip, showed her heart condition so satisfactory that she might take the trip. Her Doctor prescribed nitroglycerine tablets and also phenobarbital tablets. The phenobarbital tablets were to allay any kind of strain there might be on the heart in case of any undue excitement, or anything else that might occur. The nitroglycerine tablets were essentially dilators and were to be taken after each meal.

There is a conflict in the evidence as to whether plaintiff had been confined to her bed with sickness aboard the American Banker, but, I will accept the plaintiff's version that the steward and stewardess are mistaken, and that it was a room mate of plaintiff, and not herself, who was sick. Plaintiff had been advised to rest and she did so, finding pleasure, and making new acquaintances, but refraining from engaging in any sports requiring unusual activity.

The voyage proceeded without any unusual incidents, in so far as plaintiff was concerned, until the 23rd day of May, 1938. On that day plaintiff arose at about 7 o'clock A. M., and at about 8 o'clock A. M. went to

breakfast. After finishing her breakfast, at about 9 o'clock A. M., the plaintiff returned to her cabin, straightened things out, finished packing, and made ready her luggage.

After that she went out on the boat deck, dressed ready for landing, and wearing a fur coat and felt hat. Plaintiff had been talking to, and exchanging good-byes, with a number of people she had met during the voyage. She undoubtedly was somewhat excited, as is natural under such conditions, so much so, in fact, that she had forgotten to take her pill after breakfast.

The American Banker had, at that time, entered the lock, through which she was obliged to pass to reach berth or shed 22, where she was to make her landing.

The American Banker was in the lock, and not in motion, when the plaintiff found that she had forgotten to take her pill after breakfast, and asked the deck steward about getting some water for drinking purposes, so she could take her pill.

There was no water to he had on the boat deck, but there was water to be had on the deck below.

There is a sharp conflict in the evidence as to the conversation that took place between the plaintiff and the deck steward Walker, but it clearly appears that the deck steward, followed by the plaintiff, was moving aft along the boat deck to proceed down the stairway or companion ladder leading from the midship line of the boat deck to the port of the saloon deck, when the deck steward was called by the Purser, who was standing on the boat deck about a step away from the stairway, the deck steward turned to face the Purser, and the plaintiff passed behind his back and started down the companion ladder or stairway. No one on the ship saw the plaintiff fall, and the witness White, whose testimony was taken by deposition, said he did not see the lady fall, therefore, we have only the story told by the plaintiff, which must be considered in connection with the testimony of Miss Murphy, called on behalf of the plaintiff, and of the witnesses called on behalf of the defendant, who testified to the condition of the stairway or companion ladder and measurements thereof.

Plaintiff says that she started down the stairway having her right hand on the banister or railing, toward which she was facing. She stepped from the platform down with the right foot to the first step, then brought down the left foot, then she stepped down with the right foot to the second step, then brought down the left foot, and when she attempted to step down with the right foot to the third step, the front of the heel of her shoe on the right foot caught in, what she called, a loose plate, and in releasing it she fell down the stairs, and landed on her left side on the deck below.

No examination of the plates on any of the stairs was ever made by the plaintiff, and it seems to me that her statement that the plate was loose was only the conclusion of the witness, and a natural one, but not one supported by the facts. The cut or scrape on the heel of the plaintiff's shoe in evidence, could have been caused in many ways while falling and does not impress me as the cut or scrape which would have been caused by catching her foot in a loose plate or tread. The plaintiff was then picked up, and placed in a steamer chair, and attended by Dr. Murphy, the ship's Doctor. When picked up she was partly conscious, but soon lapsed into a coma. After plaintiff had been placed in the chair her nephew Walter Anderson, who was a passenger on the American Banker for a vacation trip, but had not come on the vessel to look after the plaintiff, his aunt, both of them having engaged their passage separately, came where plaintiff was, having been informed of plaintiff's fall by the deck steward, and engaged in conversation with certain ship officers, and a representative of the defendant, the passenger agent White.

The ship's Doctor, Dr. Murphy, did not want the plaintiff to be removed for a considerable time, when he would be able to determine she was in a condition which would permit of being safely removed, and insisted that when removed it be in an ambulance. From the first the other officers of the ship contended that there was nothing wrong with the stairs, that the plaintiff had not suffered the injuries complained of at the time. Under those circumstances the question of the ability of plaintiff to pay for hospitalization was discussed with Mr. Anderson.

The vessel had landed in the berth or shed 22, and the discharging of her cargo had commenced, and it became noisy on the side of the deck where the plaintiff was lying on the steamer chair, and Dr. Murphy had her carried, on the chair on which she was lying, to the other side of the deck, where it was much more quiet. Later on in the

afternoon, when Dr. Murphy believed it safe to move the plaintiff, she was moved to the University College Hospital.

The real question in this case, which must be first decided, is, whether or not the fall of the plaintiff at the time in question was occasioned by any defect in the stairs or the safety treads placed on the platform and steps.

The plaintiff never made any inspection of the stairs, but seems to base her conclusion that the plate was loose, because she thought she felt movement of the plate.

Miss Murphy, who was also a passenger on the vessel on that voyage, was called on behalf of plaintiff and testified that she was seated at the same table in the dining room as the plaintiff, and had become quite friendly with her.

Miss Murphy testified that about four days before the plaintiff fell, she, Miss Murphy, in attempting to descend the same stairs, wearing white buck shoes with crepe rubber soles, she came down with her right hand grasping the rail somewhat behind her, and when she attempted to remove her left foot from the third step the inside of the sole, about the middle of the foot, caught, and she was thrown forward and wrenched her arm (she went to the ship's Doctor and asked for something to relieve from the pain in her arm, for which he gave her wintergreen to rub on). She says that immediately after she looked at the step and found that on it was a metal tread in which were three screw holes on each of the forward, and after sides, in all of which were screws, except on the left hand corner aft, in which there was no screw, and that the middle screw aft was raised.

The steps on the ladder or companion way in question from the front edge of the step back to the back part of the step were each 10 inches in width, from the front edge of the step back to a point that was directly under, in a true perpendicular, the edge of the step above the steps were each 8½ inches in width, the treads each 27½ inches long, and 4½ inches in width, and the distance from each step to the one above it was 8⅜ inches.

Taking these measurements into consideration, together with the manner in which Miss Murphy says she was descending, I cannot understand how Miss Murphy could have accidentally caught her foot, in the manner in which she described, between the after side of the tread and the riser,

or back of the step, considering the overhang of the step above.

There is some difference in the testimony of the witnesses in describing the step in question by number, as on the part of plaintiff's witnesses the platform is included as stair No. 1, whereas on the part of defendant's witnesses, the platform is excluded in numbering, and the first step under the platform is described as No. 1.

I believe that both plaintiff and her witness Miss Murphy are honest in their belief that the tread of stair in question was loose, but I believe they are in error.

The stairs or companion way in question were frequently used by the ship's company and passengers, and no report had ever been made of a loose tread.

Both the Master and Chief Officer were men of great experience, and they testified that after the plaintiff had fallen and was still lying on the steamer chair on deck, they carefully examined the stairs or companion way in question, and that the treads on both of the second and third stairs, counting from the top down, were tight, with no screws missing or raised, in fact all of the screws were tight, and in place on every step of the stairs or companion way in question, and no screws were raised, except the forward out board corner of the plate on the second step from the bottom up, where the screw was missing from the broken corner.

That break had no reference to the place from which the plaintiff fell, as all witnesses on behalf of both parties referred to steps in question counting from the top down and not from the bottom up.

The hand rail and stairs were dry and the hand rail was in good condition.

The other witnesses called on behalf of defendant, who were familiar with, or had any duty with reference to the stairs, all agree that no change was made in the plates on the second and third steps from the top down, and thus corroborate the Master and Chief Officer.

Counsel for plaintiff says that the Master and Chief Officer are interested witnesses, and if that be so, it is also true that so is the plaintiff.

In weighing the testimony of the Master and Chief Officer, experienced men, I must determine whether they are, or are not telling the truth as to their examination of the stairs right after plaintiff's fall, and what they found, and I can find no reason

for refusing to believe their direct and positive testimony.

As the testimony which I have referred to covers the real issue in this case, I find no reason for referring to other testimony.

Plaintiff's objections to the depositions of James White, and William Lennox Rickcord and motion to strike out the answer to the Sixth Interrogatory to White, and the answer to the Seventh Interrogatory to Rickcord are overruled, and the motion denied.

Those answers go to the weight of the testimony, but cannot on this motion be stricken out.

The burden rests upon the plaintiff to show, by a fair preponderance of the evidence, that the plaintiff was injured as alleged in the complaint, and that the tread on the stair in question was loose and that as a result thereof the plaintiff fell and suffered the damages alleged.

This, the plaintiff has failed to do, and defendant is not bound to show the other ways the accident to plaintiff might have been caused.

A decree may be entered in favor of the defendant against the plaintiff dismissing the complaint with costs.

Settle decree on notice.

Submit proposed findings of fact, and conclusions of law, in accordance with this opinion, for the assistance of the Court, as provided by the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and the Civil Rules of this Court.